24-10-25 United States v. Christopher Pence I'm going to just take a second for some turnover because I understand there might be some people coming in and out. Is there space or not? All right. So are we all set here? Great. Let's hear it. May it please the Court, Your Honors, if you will allow me to just bullet point the circumstances which Mr. Pence confronted on the day that he was his – a search warrant was executed and he was later arrested. I think it would – even though it's in the brief, I think it would set the tone for the arguments that follow. One, pre-dawn, 13 vehicles arrived at his home, are in his driveway. Fourteen law enforcement officers are at his door. They have – he opens the door to a knock. They have weapons out. They have a shield. They have breaching tools, a sledgehammer, and some of them have helmets. His home is in an isolated part of Utah on a lonely stretch of highway and there's nothing around. Up to thereafter, up to 21 officers, law enforcement officers, enter his home. They fan out. They have their weapons out. It's in a low position so that they're not directly pointed at anyone, but they're out and in their hands. Mr. Pence is told that – he's told to call – to get his family to come down from upstairs. When he starts to go upstairs, he's told, call them, don't go upstairs. Family's in a family – a separate family room. Pence is kept in the front foyer. When he went to get his shoes in order to go outside, he was accompanied by an agent. He was asked questions for an hour and a half at the – and towards the end of it, before the Miranda warnings, he was confronted with the evidence against him. A reasonable person would not feel free to leave under those circumstances. The court's two most recent – Leaving out some bullet points, though. He wasn't cuffed. He was allowed to get in the car by himself. He was asked if he would speak. He was told he was not under arrest. There were some others as well. Yeah. No, there are – there are other facts that would support it. And the district court considered the evidence and weighed the facts and concluded that a reasonable person would not have believed that he was in custody. So, I mean, why is that clearly erroneous? Because of the volume of – of factors that show that any reasonable person would feel – would feel that they're not free to leave. You know, these physical factors like handcuffed and – or beaten, they – they're beside the point because even in Miranda, the Supreme Court recognized that in this day and age, it's really about psychological coercion. In the two most recent cases that came from – down from this court, neither – in neither of those cases was there a display of weapons. And in neither of those cases were – was there a detailed recitation of the evidence which is necessarily going to elicit a response. Can I ask a couple questions? One is, are we reviewing this as a factual determination that we review for clear error, or do we accept the district court's factual findings as to what the circumstances were and then review the conclusion as to whether it amounted to custody as a legal question? I – I think it's – it's a legal question because I – there is no dispute about what the factual findings were. There was a hearing. You know, the parties differ in terms of whether it amounts to a situation where the defendant and where a reasonable man would feel free to leave. Well, it's more than that, right? Because we – it's more than whether a reasonable person would feel free to leave. That's the – sort of the first question. Right. And if the answer to that is no, we still have to conclude whether a reasonable person would understand it to bear the hallmarks of sort of a traditional arrest versus a temporary detention that would end when, for example, the search was done. Right. And I guess more specifically, it's whether he would experience the circumstances as a custodial condition tantamount to arrest. I don't think the question is whether he thought he was under arrest. So – so – so let me – let me go to my second question, which is the – the officers come to execute a warrant, and – and for reasons that probably make some sense given all the factors here, they do it in a way that involves the show of tremendous force. Mm-hmm. And – and once they've done that, have they – is it impossible for them to solicit voluntary conversation with their prime suspect? And if so, what – what do they have to do to make sure that that's okay that they didn't do here? Read the Miranda warnings. It's so – it's just a simple thing to do. And it seems like, you know, the – the law enforcement authorities are aware of the decisions and they – and they, you know, weave in and – So – so – so when you say read the Miranda, that means he is in custodial interrogation. So really what I think you're saying in terms of the legal question here is there isn't anything – of custodial interrogation once they show up in that way. It's – it's – as a matter of law, it's sort of presumed to be – any interrogation is presumed to be custodial because of the show of force. Well, fortunately, I don't have to argue that it's only that. Oh, right. That made him feel that he was not free to leave. It was a number of circumstances that followed, being accompanied wherever he went by a law enforcement officer, having his family – being separated from his family and having them sequestered in a room. So I think – it doesn't matter what I think, unless I'm a reasonable person, which I believe I am. But with that kind of show of force, I – it's got to convey to a person that somebody did something very wrong here. And he was the, you know, patriarch of his family. So a reasonable person is going to assume he's not going to be allowed to go anywhere. The court, the district court, interestingly, I think, didn't quite apply the right standard because the court said that no reasonable person would have believed he was not free to leave. And that's framed a little differently than a reasonable person would not feel he's free to leave. But it just – it's not true that no reasonable person anywhere, a person who's reasonable, would feel under all those circumstances that he was free to leave. Right. But again, that's not the test, right? That's – it's whether they feel that this is a temporary incursion versus something more like an arrest. Right. Yeah. Okay. I think we're going to have the opportunity to hear from you in rebuttal. Yes. All right. Great. Well, maybe we'll let the government jump in at this juncture. Sounds right. Attorney Perry. Good morning, Your Honors. May it please the Court and Michael Perry for the United States. And I want to thank the Court for allowing me to appear remotely under the circumstances of the lapse in government appropriations. In terms of the show of force, just to jump in there, what happened there with the 13, 14 officers that initially made entry and then with others who came in to help secure the evidence was definitely reasonable under the circumstances. This was an exceptionally large home and an exceptionally large family. There were something like 20 people in the home. Also, law enforcement had information that came out at the suppression hearing that they believed there would be a gun in the house. They did recover a gun. They weren't threatening people. They secured the house pretty quickly. But the argument – And that's a very standard thing. The argument is not that this was an unreasonable show of force, but it lends to the atmosphere to suggest that he felt he was under arrest. That's the argument. I understand that, Your Honor. I agree that's the argument. But under the circumstances, a reasonable person recognizing how big the house is, how big the family is, how many rooms would need to be secured and that sort of thing would understand that, you know, just the fact that so many officers came to the house didn't make this an inherently custodial situation. The Schaefer case in 2017 from this court, which Judge Branas authored, says that the number of officers is typically not dispositive of the custody termination. I think that's especially true here where there was a reason for it. Also, as was mentioned, the fact that he was given the choice in the first place, do you want to speak? And if so, where do you want to speak? You know, it made sense for him to choose to speak outside. I mean, he was ultimately going to be talking about a hit that he called in on the birth parents of his adopted children. Certainly, you know, having it be in the Tahoe gave him a greater sense of privacy. That was not inherently coercive. It was a benefit to him. That was a better place for him to talk about this. Objectively, under the circumstances, he could have chosen, you know, no, I want to do it here. This is my bedroom. This is my study. Wherever it was that he wanted to do it, he chose to go outside. Well, can I jump in on that? Sorry. Obviously, he doesn't necessarily know that's the subject of the conversation at the time he agrees to talk. And one of the things I'm struggling with is even if I'm with you 90% of the way, even if I say yeah, he's voluntarily agreed to talk. He was told he wasn't under arrest. He went in voluntary on his own, you know, ambulation and got into the SUV and started chatting. And chitchatted for 90 minutes, and there's nothing about that that suggests that he's got the indicia of arrest. And then 90 minutes later, in that confined space, with all of the show of force still on the premises, long after he's told he doesn't have to talk, he's confronted with incriminating evidence of a very, very, very serious crime. At that moment, how could any reasonable person think, oh, this is just a temporary incursion on my freedom, and I'm totally free to go as soon as the search is done? Doesn't that signal we got you? I don't think so, Your Honor. There was testimony. I guess I don't want to get into what the officers were thinking, but objectively, in terms of whether the show of force was ongoing, by the time they got to asking him those questions, an hour and a half or so had elapsed since they entered the Tahoe. I mean, the force was not on display so much as just the processing of getting documents and that sort of thing. Nobody was standing guard outside the Tahoe. There was nobody that was preventing him from leaving. And I think under the circumstances—  Sorry, just to be clear, the 90 minutes, it was 90 minutes in the Tahoe. It was also 90 minutes since anybody had told him he was free to leave and didn't have to talk. Is that right? At the time they confronted him with this evidence. And they didn't repeat, now, you don't have to say anything, but I want you to know we have this evidence, or you could leave, but I want you to know that we have this evidence. They said, we have this evidence. What are you going to say to that? I do agree, Your Honor, that I don't believe there was a repeat of the indication that he didn't have to answer their questions, you know, 90 minutes in, but I don't think that's required here. And the case law that was cited in the reply brief about this idea of, you know, confronting somebody being somehow positive, none of those cases actually stand for that proposition in a way that would be either persuasive or controlling. The Jones case is unpublished, and that's from the Fourth Circuit, and that talks about the standard for inmate interviews, which is not an issue here. The Maine v. Thibodeau case, that was just a dissent by Chief Justice Berger for certain denial. And then the other cases are, you know, also not positive here. So I don't think that, you know, the fact that somebody has asked questions about what they did is dispositive, particularly under the circumstances here where there were other adults in the house, and the point of these questions was ultimately to figure out, was somebody else using the phone or computer, you know, one of the other adults or older children, or was it really him? And that's why, you know, Oscar Dekar testified he didn't have probable cause to arrest him, you know, when they showed up. And the district court judge credited that part of his testimony. I'm trying to figure out how that plays in. I mean, if they didn't have probable cause, I suppose, as a Fourth Amendment matter, it means they can't seize him and they can't subject him to a custodial interrogation. As a Fourth Amendment matter, wholly apart from the Miranda obligation under the Fifth Amendment, I don't understand how that advances the conversation, though. I guess the point is that they were asking questions to elicit information that, you know, the nature of his relationship with the various members of the family, who was in, you know, who had which devices and that sort of thing, and then once they start confronting him, you know, they say, you know, we knew you were online, that sort of thing. I mean, it was not presented in an aggressive way. And I realize that the transcript was not actually provided by either of the parties. The court or the government can make it available to the court if needed. It was provided to the district court, both the recording and the transcript. So it is in the record. But, you know, the question is not along the lines of you're going to prison for the rest of your life because we know you hired a hit man. It was more in the nature of we know you went online to the dark web. And he had already lied about that earlier in the conversation. And so this is not some form of aggressive questioning that one would associate with, you know, being in custody. I think also what – oh, please. I just want to unpack that a little more, poke at it a bit. You know, tone of voice can matter. But I'm just wondering whether the message that we have incriminating evidence that you've committed a heinous crime, even delivered in a very calm and nonchalant way, could still convey to somebody, probably would still convey to somebody that they're not going to say, oh, we're done talking here. I'm going to get out of the car and leave, that at that point they got you. Well, I mean, as is often the case in these types of interviews, they also presented it in a way which they're allowed to do, the officers of, you know, help us get to the real bad guys here. Help us to figure out who's out there committing these hits, you know. We have questions about, you know, how this sort of thing works. We don't want anyone to get hurt. Those are some of the sorts of things that were addressed, not, you know, we got you, you're going down today. That was not the tenor of the questioning. Fast forwarding to the end, too, or not to the end, but a couple hours later, after they've given him Miranda, after he's confessed, his dogs come up, you know, outside. There's still no guard posted out. And he gets out of the car. He felt comfortable even after Miranda to just get out of the car without asking permission. He was asked, you know, to get back in because by then he was, you know, the officers considered him to be in custody. But I think that goes to sort of the objective circumstances here is that, you know, what he actually did shows that he believed that he was free to get out of the car even after Miranda, even though that turned out not to be true because they told him to get back in. Is it a subjective test or an objective test whether a reasonable person in this situation would perceive himself to be functionally arrested? Certainly it's an objective test, Your Honor. But I think, you know, what somebody actually does can, you know, inform what, you know, what the objective facts would be because, you know, we know as a matter of fact, for example, that proves that the door was unlocked. So there's no question about that sort of thing. But, yes, I'm not arguing that it's a subjective inquiry, Your Honor. I see my time is about to expire. I'm happy to answer any other questions. Otherwise, the government would rest on the brief of the record and ask this Court to affirm. Thank you. Thank you very much. Attorney Wolf. Thank you, Your Honors. That an individual under circumstances like this chooses to speak is neither here nor there. The question is, not the question, but the proposition from Miranda is it's not an informed choice without the Miranda warnings. It's not whether they choose to speak. It's whether there are circumstances that convey to this individual that he is not free to leave, that his personal agency is constrained. The case law about confronting a suspect with evidence against him, those are just cases that say it's part of the inquiry. I'm not sure I've seen it in the Second Circuit's case law, but in a number of other circuits, they list it as a consideration of whether a person feels they're not free to leave, and also at that point, when they are telling you everything, not everything, but what you've done wrong, that's not, that's, nobody's going to feel free to leave under those circumstances. Ms. Wolf, what did Judge Hurd have to say about this? How would you describe Judge Hurd's findings? I would describe his, well, I would describe his findings to be what he views as a reasonable person, and which is, you know, that's, this isn't clearly a reply, but that's where Diaz comes in. We need to figure out what a reasonable person is. I just want to make one other point, which is that the first inquiries that the officers make are all about who uses the computers and where they are. So they are eliciting the information that they say they need in order to take him into custody. They still don't read the Miranda rights, and they continue to question him. Thank you, Your Honors. Thank you very much. Appreciate your arguments on both sides. We will take this case under advisement. Appreciate it.